STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RONALD BAROWSKI, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued May 11, 1988—Decided July 5, 1988.

Before Judges KING, GAULKIN and D'ANNUNZIO.

*J. Michael Blake,* Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Greta-Ann Gooden,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards,* Attorney General, attorney).

The opinion of the court was delivered by

GAULKIN, J.A.D.

Following a pretrial *Miranda*[1] hearing at which his statement was held admissible at trial, defendant pleaded guilty to second-degree official misconduct (*N.J.S.A.* 2C:30-2 a). The Law Division judge invoked *N.J.S.A.* 2C:44-1 f(2) and sentenced defendant to a three-year custodial term. Defendant now appeals from the pretrial evidentiary ruling. *See R.* 3:9-3(f). He has been granted bail pending appeal.

The operative facts are largely undisputed. Defendant was an East Windsor Township police officer. He had lived with his girlfriend, Jaye Pederson, at the home of Pederson's mother, Pearl Elkins. After she had evicted defendant and Pederson, Elkins contacted the East Windsor Township Police Department and informed Sergeant Vukson that she had found some wrappers in her home which she suspected were used to package narcotics. A consent search of Elkins' home yielded approximately 300 pill wrappers with traces of methaqualone and, the police believed, one or two methaqualone pills (quaaludes).

An officer noted the similarity between the wrappers found at Elkins' home and evidence which had been seized in 1977 and stored in the police evidence locker. Further investigation disclosed that the evidence locker was approximately 9000 quaaludes short of the 38,000 to 39,000 pills which were supposed to be there. The green plastic bag containing the quaaludes, moreover, had a hole in it.

Wrappers from the Elkins house and from the evidence locker were submitted to the State Police laboratory, which confirmed that they matched. Vukson, with apparent approval from the Police Chief Michnisky, decided to arrest defendant. Sergeant Van Hise called defendant at his parents' home, where he was then living with Pederson, and asked him to come to the station to report to work. Defendant arrived at approximately 4:10 p.m. and went into Van Hise's office, where Van

---

[1]*Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.2d* 694 (1966).

Hise, Vukson and Detective Rossi were waiting. Vukson asked defendant to turn in his gun, told him he was under arrest and advised him of his *Miranda* rights. Defendant signed a Uniform Mercer County Rights Form; Van Hise also read aloud the *Miranda* warnings from the form. Defendant signed the form in the space provided immediately after the section discussing waiver of rights. Defendant stated that he had nothing to say at that time.

After taking defendant for fingerprinting and mug shots, Van Hise took him to the security area. Normal procedure was to place an arrested person in a cell, but Van Hise acted otherwise because he and defendant had been close friends. While in the matron's office, Van Hise and defendant sat and talked of old times. Van Hise testified that he did not demand that defendant give a statement or make any promises to defendant to obtain a statement. He admitted, however, that both he and Michnisky separately urged defendant that he should or had to help himself by giving a statement. Michnisky confirmed that testimony and acknowledged that because defendant was sitting in the only chair at the desk, he "was down on one knee talking across the desk to [defendant]." Rossi acknowledged as well that he had urged defendant to help himself. Defendant, however, again chose not to make any statement.

At approximately 5 or 6 p.m., Pederson was brought to headquarters and given her *Miranda* warnings. She was then turned over to Michnisky and Lieutenant Heyesey of the Prosecutor's office. They explained to Pederson the charges against defendant and asked her to give a statement. According to Heyesey, they made no promises to Pederson, but did tell her that they might be able to recommend that defendant be released on his own recognizance (ROR) depending on the substance of her statement. Pederson waived her right to remain silent and, between 7:25 and 9:22 p.m., gave a statement which implicated herself, defendant and another police officer from a different municipality.

When Pederson's statement was completed, Heyesey went to see defendant. In response to defendant's inquiry, Heyesey said he would ask Michnisky if defendant could meet with Pederson. Heyesey also told defendant that he would attempt to have him released on his own recognizance because he did not want defendant exposed to the special dangers which face an incarcerated police officer. Defendant and Pederson were then allowed 10 to 15 minutes for a private meeting. At its conclusion, defendant agreed to give a statement. *Miranda* warnings were again administered and, this time, were waived. The statement was taken from approximately 10:12 to 11:20 p.m.

Meanwhile, at approximately 6 or 7 p.m., Municipal Court Judge Doig met with Michnisky and Heyesey to discuss defendant's arraignment. Doig told the officers that he would consider their recommendations in setting bail but that he would release defendant ROR if they could not assure his safety in jail. The officers said they would see what they could do. At the *Miranda* hearing, Doig testified that he had no recollection of any particular amount of bail being discussed, but that his impression was the police were suggesting a substantial bail or some bail that defendant could not meet. Doig maintained contact with the police during the evening. After defendant had given his statement, Doig was told by Rossi that the police recommended that defendant be released ROR. At about midnight, Doig arraigned defendant and released him on a $10,000 personal recognizance bond.

Defendant's testimony at the *Miranda* hearing was substantially in accord with the facts we have recited. He added, however, that Vukson initially told him that his bail would be $100,000. When Pederson was brought to the station, Heyesey told him that she would not speak unless defendant approved. Defendant asked if Pederson would be charged and Heyesey replied that he did not think so. Defendant then told Heyesey that it would be all right for Pederson to give a statement so long as she would not be charged. Heyesey responded that he

could not so guarantee but would try to assure that she was not charged. After instructing Heyesey to tell Pederson that she could give a statement, defendant asked Heyesey why his bail was so high. Heyesey indicated that the court had set bail but that if defendant gave a statement he would try to get him released ROR. Defendant testified that he had also asked Vukson whether they would go easier on Pederson if he gave a statement and that Vukson replied he would see what he could do. Defendant testified that he interpreted the officers' comments as meaning that unless he gave a statement he would be facing a $100,000 cash bail.[2]

In holding the statement admissible, the motion judge found that defendant had not been subjected to "persistent questioning" but that he had been urged by his police colleagues "to cooperate with law enforcement officers and to give a statement." On at least three occasions defendant "had asserted his Fifth Amendment privilege." Vukson had suggested, and Michnisky initially acquiesced to, "the concept of high bail." Although unknown to defendant, Doig had taken the position early in the evening that "unless [defendant] could be safe, he wasn't going to be incarcerated." The motion judge found that defendant

chose to strike a bargain with his fellow officers; namely, that he would have low bail and, namely, that Jaye Pederson would not be charged.

After that bargain was struck, Doig was called for the arraignment

and everyone feels that [defendant] has cooperated with law enforcment, and the police are going to argue for an ROR bail, which the Judge said he would already consider.

The motion judge, however, specifically found that Doig's delay in arraigning defendant "was to benefit the defendant, not to engage in any conspiracy inadvertently or advertently with the police to get a statement from [defendant]."

---

[2]Neither Vukson nor Pederson testified at the *Miranda* hearing. Vukson had died; Pederson asserted her Fifth Amendment privilege against self-incrimination.

The *Miranda* hearing was conducted some six months before our Supreme Court handed down *State v. Hartley*, 103 *N.J.* 252 (1986), which holds

> that before an accused's previously-asserted right to remain silent may be deemed to have been "scrupulously honored," law-enforcement authorities must, at a minimum, readminister the *Miranda* warnings. In the absence of those renewed warnings any inculpatory statement given in response to police-initiated custodial interrogation after the right to silence has been invoked is inadmissible. In addition ... a police failure scrupulously to honor an accused's earlier-invoked right to silence amounts to a violation not simply of *Miranda*'s prophylactic rules but of the accused's privilege against self-incrimination. Therefore, any statement that a suspect may make after his right to silence has not been scrupulously honored is unconstitutionally compelled as a matter of law.

*Id.* at 256. Relying on *Hartley*, defendant urges that "[t]he failure of the police in this case to scrupulously honor [his] assertion of his rights to remain silent by readministering *Miranda* warnings prior to their repeated attempts to convince [him] to confess, requires that his confession be found not admissible."

The State candidly acknowledges "that the resumption of custodial interrogation of defendant without readministering fresh *Miranda* warnings unquestionably amounted to a failure by law enforcement authorities to 'scrupulously honor' defendant's claimed right to remain silent under [*Hartley*]." The State urges, however, that the constitutional violation "did not produce the statement in question," that "any 'taint' accruing from that violation was sufficiently attenuated to dissipate the taint" and that accordingly the statement "cannot be deemed to be unconstitutionally compelled."

We are satisfied that *Hartley* requires suppression of defendant's statement. Here, as in *Hartley*, the officers "overcame defendant's previously-expressed refusal to speak" by "pressure-laden" expressions of their desire to get him to talk. *Id.* at 268–269. Thus "the non-observance—to say nothing of a nonscrupulous observance—of defendant's previously-asserted right to silence is a most likely, if not inescapable, conclusion." *Id.* at 271. Had the police taken the statement without read-

ministering the *Miranda* warnings, defendant's statement would indisputably have been inadmissible under *Hartley*. On the record before us, the readministration of warnings after the conceded constitutional violation does not justify a different result.

*Hartley* considered a similar question. After holding inadmissible Hartley's statement given to federal authorities who had failed to "scrupulously honor" his previously-invoked right to silence and had not readministered *Miranda* warnings, the Court considered the admissibility of a subsequent statement given to state authorities and preceded by fresh warnings. *Id.* at 279.

The Court found the second statement inadmissible as well, under each of two alternate approaches. Relying on *Westover v. United States*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), the Court held that the second interview, conducted in the same room and shortly after the first, "followed so closely on the heels of the first as to be part and parcel of it, and hence to be burdened with the same constitutional infirmities." 103 *N.J.* at 280. The Court also cited with approval the language of *People v. Washington*, 127 *Misc.*2d 451, 486 *N.Y.S.*2d 660 (Sup.Ct.1985), that " '[a]n otherwise admissible statement may be suppressed if it constitutes part of a continuous interrogation initiated by improper questioning or other wrongful acts or omissions by law enforcement officers.' " 103 *N.J.* at 281.

■ That analysis is equally compelling here. The improper entreaties of his fellow officers over a six-hour period overcame defendant's previously-expressed refusal to speak. Immediately thereafter and at the same location, the *Miranda* warnings were readministered and the statement taken. The taking of the statement thus can only be characterized as "continuous" to and "inextricably entwined" with the improper conduct. *Id.* at 279, 280.

*Hartley* 's alternate basis for rejecting the statement given after readministration of *Miranda* warnings proceeds from its

holding that the failure to "scrupulously honor [defendant's] previously-invoked right to silence was a violation of constitutional magnitude." *Id.* at 283. That circumstance, the Court held, "triggers the 'fruit of the constitutional violation' doctrine." Under that doctrine, the question is whether the statement is the product of the violation or whether the constitutional "taint" was attenuated. *Id.* The Court found it unnecessary to remand the matter for findings and conclusions as to that question

> for we are satisfied, on the basis of our careful appraisal of the full and complete record before us, that the second statement, coming as it did on the heels of—if not in tandem with—the first, unconstitutionally-obtained, compelled statement, was unavoidably tainted. The most generous and indulgent view of the record cannot generate a conclusion of sufficient attenuation between the first and second interrogations to dissipate the taint. The second statement, chameleon-like, retains the coloration of the first as a matter of law, and hence must itself be deemed to have been unconstitutionally compelled.

*Id.* at 284.

The facts here require a similar conclusion. Defendant's statement, although preceded by *Miranda* warnings, came on the heels of the constitutional violation and must realistically be viewed as a product of that violation. There are no intervening facts which can be said to explain the statement or attenuate the constitutional taint. *See Hartley,* 103 *N.J.* at 283. We are unpersuaded by the State's suggestion that the taint had evaporated because "[a]t least two hours passed between [Michnisky's] visit and defendant's decision to give a statement." Various officers at various times urged defendant to help himself. In fact, his self-help was closely connected to the bail determination which was not made until after defendant had given his statement. The continuing and compelling influence of the constitutional violation thus cannot be denied. The readministration of *Miranda* warnings was, in that setting, cosmetic only.

In light of those conclusions, we need not address any of the remaining issues raised on the appeal.

The judgment is reversed. The matter is remanded to the Law Division for all further proceedings.