237 N.J. Super. 250 (1989)
567 A.2d 287
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
PHILLIP REYES, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 30, 1989.
Decided December 11, 1989.
*253 Before Judges J.H. COLEMAN, BAIME and D'ANNUNZIO.
John S. Furlong argued the cause for appellant.
John J. Scaliti, Deputy Attorney General, argued the cause for respondent (Peter N. Perretti, Jr., Attorney General of New Jersey, attorney; Mr. Scaliti of counsel and on the brief).
The opinion of the court was delivered by COLEMAN, J.H., P.J.A.D.
In a jury trial, defendant was convicted of aggravated sexual assault, contrary to N.J.S.A. 2C:14-2a and possession of a knife for unlawful purposes, contrary to N.J.S.A. 2C:39-4d. After merging the possessory offense with the aggravated sexual assault, defendant was sentenced to a custodial term of 20 years with 10 years of parole ineligibility. Defendant has appealed, contending:
I THE TRIAL COURT'S DENIAL OF MOTION TO SUPPRESS DEFENDANT'S STATEMENT WAS ERROR.
II THE TRIAL COURT'S REFUSAL TO PERMIT EXAMINATION OF THE VICTIM IN A WADE HEARING WAS ERROR.
III THE TRIAL COURT'S DENIAL OF DEFENDANT'S MOTION TO SUPPRESS POLYGRAPH RESULTS WAS ERROR.
IV THE TRIAL COURT'S DENIAL OF DEFENDANT'S MOTION FOR MISTRIAL WAS ERROR.
V THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.
We now affirm the judgment of conviction.

I
Based on the evidence presented, the jury could have determined the following occurred. On January 21, 1987, B.B., a 24 year old female from Bedford, New Hampshire, was staying with her aunt in Linden while looking for a job with an airline. At about 2:30 p.m. on that day, B.B. answered her aunt's doorbell and admitted a male, she later identified as defendant, who said he was a representative from the gas company and was responding to a call concerning a gas leak. B.B. accompanied *254 the male into the well lit basement where she showed him the heating unit. After fiddling with the unit for about one minute, the male turned around and grabbed B.B. Although B.B. pushed him away, the male attacker grabbed her again, hit her on the side of the head and wrestled her to the floor. After hitting her again, the attacker placed the blade of a knife against her neck, and told her to remove her clothes. He told B.B. that she would live if she followed his instructions. B.B. decided to cooperate. The perpetrator forced B.B. to perform fellatio and he also achieved vaginal penetration. The victim was hospitalized for surgery to curtail bleeding caused by a vaginal laceration.
The focus of the investigation turned to defendant when co-workers at Park Common Molding in Linden saw a composite drawing of the perpetrator made with the victim's assistance. One co-worker cut out the composite drawing from the newspaper and hung it on a wall in the factory. Defendant's place of employment was a two or three minute walk from the rape scene.
Detective Vincent Klebaur, who headed the investigation, arrested defendant on February 10, 1987, based on a New York warrant for robbery. Defendant was advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and he was also advised that he was a suspect in the rape investigation. A photograph taken of defendant on the date of his arrest was placed in a photographic array that contained seven pictures of other persons similar in age and appearance to defendant. The victim selected a picture of defendant and one other male and said either could be her attacker, but if she heard them speak, she could positively identify the perpetrator.
Defendant agreed to participate in a lineup that was conducted on the morning of February 11, 1987. The lineup was comprised of six other males fitting defendant's general characteristics. Each was asked to utter 17 phrases and to wear a *255 white hard hat the assailant wore during the rape. The victim positively identified defendant in the lineup.
Following the lineup, defendant was questioned by Detective Klebaur for approximately five hours. The detective discussed defendant's family and religion in the hope of gaining his trust. Defendant gave a typewritten statement to Klebaur that evening between at 8:25 p.m. and 11:20 p.m., wherein he denied any involvement in the assault.
On the following morning, February 12, 1987, Assistant Prosecutor David Hancock met with defendant in a conference room at the Union County Prosecutor's Office and discussed administering a polygraph. Hancock read an eight page stipulated polygraph form to defendant "word for word" and explained its meaning to him. The form stated, among other things, that the purpose of the polygraph examination, which was to be conducted by Investigator Peter Brannon, a polygraph expert employed by the State, was to inquire into the sexual assault upon B.B. The form indicated that defendant was waiving his right to remain silent. Defendant acknowledged that he was entering into the stipulation freely and willingly and that the examiner's opinion would be admissible at trial. Defendant also waived any and all objections to the admissibility of Brannon's expert testimony but reserved the right to cross-examine Brannon regarding his qualifications, the manner in which the examination was conducted, the questions posed, his opinion as to whether defendant exhibited evidence of deception and the possibility of error. The form also indicated that neither party had the right to introduce another polygraph expert or the results of any other polygraph examination during trial. After having each page read to him, defendant wrote on the stipulation "No question, I fully understand." Defendant initialed each page and signed the last page.
Brannon administered the polygraph test and concluded that defendant gave deceptive answers. When informed of that opinion, defendant expressed disbelief. After defendant was *256 again given new Miranda warnings, he gave an oral inculpatory statement followed by an eight page written confession. In it, he admitted he committed the aggravated sexual assault in the manner essentially described by the victim. The polygraph results and the written confession were admitted as evidence.
Defendant testified at the trial and told a different story. He denied that he committed the aggravated sexual assault. He admitted, however, that he voluntarily (1) participated in the lineups, (2) gave samples of blood, semen and hair, and (3) took the polygraph examination after he had been positively identified in the lineup. He testified that the confession was coerced and that Detective Klebaur supplied the answers. He said that he requested an attorney after he was informed that he had failed the polygraph examination but before the oral or written statements were taken.

II
Under the first point heading, defendant contends the trial judge failed to conduct a full and fair Miranda hearing and that the court erred in not suppressing his confession. He asserts that the trial judge denied him the opportunity to present testimony at the Miranda hearing which would have challenged the credibility of the State's evidence respecting whether his will had been overborne. He also contends that his request for counsel was not "scrupulously honored" and that his confession was not voluntary. In addition, defendant argues that the judge failed to make findings concerning the circumstances surrounding his continued detention following a "pretextual arrest" pursuant to an out-of-state warrant without being brought before a magistrate. We find all of these contentions to be unpersuasive.
At the Miranda hearing, Detective Klebaur and Investigator Edward Johnson of the Union County Prosecutor's Office testified for the State. Through their testimony, the State established that after defendant was arrested on February 10, 1987 *257 on a New York warrant, a teletype was sent to the New York authorities that day advising them of defendant's arrest. As noted earlier, defendant was read the Miranda warnings at the time of arrest and he was advised that he was a suspect in the rape of B.B. Defendant was taken to the Linden Police Headquarters and was again given the Miranda warnings. Klebaur questioned defendant for about two hours concerning B.B.'s rape which defendant denied. Defendant spent the night in the Linden jail. The lineup was conducted the morning of February 11 and B.B. made a positive identification of defendant from the lineup. Klebaur and Johnson questioned defendant for about two hours on that afternoon and defendant continued to deny any involvement. A written exculpatory statement was taken from defendant the evening of February 11 between 8:25 p.m. and 11:20 p.m. Defendant also spent the night of February 11 in the Linden Jail.
On February 12, the polygraph examination was conducted at the Union County Prosecutor's Office and defendant was advised at about 11:30 a.m. or 11:45 a.m. that he failed the test. Defendant was questioned for the next 45 minutes in a conference room at the prosecutor's office. At approximately 12:30 or 12:40 p.m., Klebaur left the room while Johnson and defendant continued to converse about the case. During their conversation, defendant requested an attorney. Johnson replied "okay," told defendant there would be no more questions and stated that the interview was at an end and informed defendant he would have to appear before a judge to make his request known. At that point, defendant asked for a cup of coffee and Johnson left the room to obtain the coffee. As he did so, he asked Klebaur, who had been outside the room, to watch defendant since he was not handcuffed. Johnson told Klebaur that defendant had requested an attorney.
Klebaur entered the conference room and stood against the wall. At that point, defendant initiated a conversation with Klebaur stating "Vinnie, I'd like to talk to you about this." Klebaur replied, "I'm sorry, Phil, Detective Johnson just advised *258 me that you wanted an attorney; I can't talk to you." Defendant then said, "I don't want an attorney ..., I want to talk to you."
Johnson returned to the room at that point after being absent for about a minute. Klebaur informed Johnson that defendant wanted to talk to the two of them without an attorney. Johnson then asked defendant if this were true and defendant said yes. Johnson advised defendant to drink his coffee and think about what he wanted to do. Johnson told defendant that he and Klebaur would wait outside the conference room and that defendant should let them know when he made up his mind. Defendant was told, "[w]hatever you want to do, that's what we'll go along with."
Approximately 10 to 20 minutes later, defendant exited the room and was granted permission to use a telephone. He was unable to get through to the party whom he desired to reach. Defendant then asked if he could return to the conference room to continue thinking about what he wanted to do. The officers agreed. About six or seven minutes later, defendant left the room and told the officers that he wanted to continue to talk to them without an attorney. Before reinstituting the conversation, defendant was again advised of his Miranda rights. He signed a waiver of these rights at 1:27 p.m. in the presence of Assistant Prosecutor Brian Gillet.
Defendant and Klebaur went into another office and continued their discussion. Defendant initially protested his innocence but expressed interest in Klebaur's remarks concerning other individuals whom he had arrested for similar crimes and what had happened to them. Defendant then asked Klebaur hypothetical questions, i.e., "if I had done this, what would happen to me;.... If I have to go to jail will you come visit me?" Klebaur used various techniques in his attempt to obtain a confession such as blaming the victim for the crime, discussing religion and forgiveness, and expressing sympathy. Thereafter, defendant provided Klebaur with an oral confession. *259 Defendant "broke down" several times while giving his confession and cried on Klebaur's shoulder. Defendant then agreed to provide a written statement.
Prior to making his written statement, defendant's request to make a telephone call was granted. He called a neighbor. He then gave a written confession to Klebaur and Johnson which began at 3:40 p.m. and concluded at 4:45 p.m.
Defendant stated in his typed confession that all questioning stopped after he asked for a lawyer. He admitted that he subsequently initiated a conversation with Klebaur wherein he told the detective that he wanted to continue the interview and did not want a lawyer. Defendant also indicated in his statement that no one influenced him not to have a lawyer and that this was a decision made of his own free will.
Klebaur and Johnson testified that defendant was not forced or threatened to give a confession. Klebaur maintained that he never told defendant that he would help him in any manner if he cooperated with law enforcement officials. On the contrary, Klebaur told defendant that he could not make any promises to him and that the judge would decide how much time he had to spend in jail. However, Klebaur told defendant that he would probably be sent to Avenel since most sex offenders are placed in this facility. Klebaur made it clear that Avenel is a prison as opposed to a hospital. Johnson similarly testified that he never made any representations to defendant concerning the type of sentence he would receive if he cooperated with the police.
Defendant also testified at the Miranda hearing, and as noted earlier, told a story that differed markedly from the State's evidence. The trial judge concluded that the officers scrupulously honored defendant's request for an attorney and that they would have stopped the questioning at any time had defendant so requested. The judge found the testimony of Klebaur and Johnson to be "most credible" and defendant's testimony to be "incredible." The judge found that when defendant gave the confession, he was aware that the victim *260 had identified him in the lineup and that he had failed the polygraph, both of which were voluntarily undertaken by defendant. The judge found that defendant knowingly and voluntarily waived his Miranda rights and gave a voluntary confession after he "saw the handwriting on the wall."
Based on our careful study of the record, we are completely satisfied that the police officers scrupulously honored defendant's request for an attorney and did not initiate any further questioning of him until after he had knowingly and intelligently waived his right to counsel which he had invoked previously. Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984); Edwards v. Arizona, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1884-1885, 68 L.Ed.2d 378 (1981), reh. den. 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981); State v. Bey, 112 N.J. 123, 142 (1988); State v. Hartley, 103 N.J. 252, 277 (1984); State v. Larry, 211 N.J. Super. 221, 227 (App.Div. 1986). The bright line rule established in Edwards was followed in this case. The fact that defendant was arrested under the New York warrant for robbery and then questioned about the rape is immaterial. Michigan v. Mosley, 423 U.S. 96, 98-99, 104-107, 96 S.Ct. 321, 323-324, 326-328, 46 L.Ed.2d 313 (1975).

III
We also reject defendant's assertion that his confession was involuntary because it was the product of physical and psychological coercion. The trial judge found the evidence did not support defendant's claim and we find no warrant to disturb that finding. State v. Johnson, 42 N.J. 146, 162 (1962). Under the totality of the circumstances, the techniques used by law enforcement officials to obtain the confession were not inherently coercive and there was no credible evidence that the police resorted to any improper psychological or physical pressure to obtain the confession. Fare v. Michael C., 442 U.S. 707, 726-727, 99 S.Ct. 2560, 2572-2573, 61 L.Ed.2d 197 (1979); State v. Miller, 76 N.J. 392, 402-405 (1978). See also State v. *261 Bey, 112 N.J. at 134-135 Those circumstances include the fact that defendant was 27 years old at the time and had attended high school until he was 18 and later received one-year of technical training. The judge who observed defendant concluded that he was not stupid. Before the confession, defendant had been given Miranda warnings four times or more, the last occurred just before he confessed. Furthermore, during the confession, he was asked how had he been treated over the two day period and defendant said "very well." He was also asked whether he had been "allowed to use the bathroom, eat, have cigarettes, and to make telephone calls when he wanted to" and defendant answered yes. The totality of the circumstances compellingly establish that the State satisfied its burden of establishing that the confession was voluntary. State v. Yough, 49 N.J. 587 (1967).
Defendant argues for the first time that the confession should have been suppressed because he was not taken before a judge within a reasonable time after his arrest for the New York robbery and that that violated the Uniform Criminal Extradition Law, N.J.S.A. 2A:160-18 or N.J.S.A. 2A:160-22. While the failure to take defendant before a judge is a factor to be considered in determining the voluntariness of his confession, it does not in itself render an otherwise voluntary confession inadmissible. State v. Barry, 86 N.J. 80, 90-91 (1981), cert. den. 454 U.S. 1017, 102 S.Ct. 553, 70 L.Ed.2d 415 (1981); State v. Jones, 53 N.J. 568, 570-573 (1969), cert. den. 395 U.S. 970, 89 S.Ct. 2122, 23 L.Ed.2d 759 (1969); State v. Seefeldt, 51 N.J. 472, 486 (1968). As previously discussed, the record fully supports the trial judge's finding that defendant's statement was made voluntarily.
Defendant's reliance on State v. Barowski, 226 N.J. Super. 235 (App.Div. 1988) is misplaced. Although there was a delay in that case before the defendant was taken before a judge for arraignment, that was not the basis for the Appellate Division's decision suppressing defendant's confession. Rather, the suppression *262 was based on the fact that defendant's assertion of his right to remain silent was not scrupulously honored by the police. Id. at 237-239, 241. Hence, we find that the failure to take defendant before a judge promptly was not clearly capable of producing an unjust result. R. 2:10-2.
Defendant further contends that he was denied a full and fair Miranda hearing because he was precluded from producing some evidence related to whether his will was overborne. This argument is grounded on the fact that defendant's cousin, Rogelio Lanzot, testified that he went to the Linden Police Headquarters the morning of February 11, 1987 to speak to defendant and to try to post bail. He said he was told by the desk officer that he could not post bail and that he should come back the next day to see defendant. The judge concluded that Lanzot's testimony was irrelevant since he was not an attorney and terminated his testimony. Defendant also proffered the testimony of Ellen Shavaro who would have testified as to what the desk officer allegedly said. The judge concluded that such testimony would also be inadmissible hearsay. Although a defendant is entitled to a fair hearing to determine the underlying facts bearing on the issue of whether a confession is voluntary, Jackson v. Denno, 378 U.S. 368, 380, 84 S.Ct. 1774, 1782, 12 L.Ed.2d 908 (1964), our rules of evidence respecting relevancy apply to such a hearing. State v. Cavallo, 88 N.J. 508, 526-529 (1982); Evid.R. 8(3). Even if the proffered testimony was relevant, failure to admit it was harmless error. R. 2:10-2.
We have considered the remaining issues raised in the brief and find they are clearly without merit. R. 2:11-3(e)(2). We add only that if defendant wanted the victim to testify at the hearing conducted pursuant to United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), he could have called her as a witness. Moreover, defendant failed to make a threshold showing entitling him to a full Wade hearing. State v. Ortiz, 203 N.J. Super. 518, 522 (App.Div.), certif. den. 102 N.J. *263 335 (1985). The sentence complies with the guidelines articulated in State v. Roth, 95 N.J. 334 (1984) and State v. Hodge, 95 N.J. 369 (1984) and was warranted in this case.

IV
Finally, at the request of defense counsel, we address an issue presented at oral argument that was not listed in the brief. Defense counsel argued that the polygraph examination results should be suppressed because defendant was unrepresented by counsel when he entered into the stipulation. Ordinarily, an attorney is not permitted to argue a point not raised in the brief. Whitfield v. Blackwood, 101 N.J. 500, 504 (1986), Clifford, J., concurring; Kirzenbaum v. Paulus, 57 N.J. Super. 80, 84 (App.Div. 1959). For the sake of completeness, we required counsel to brief the issue and we now conclude the issue lacks merit.
It is now well established that the only way to admit as evidence the results of a polygraph examination is for the State and the defendant to enter into a stipulation. Generally, the stipulation will be honored. State v. McDavitt, 62 N.J. 36, 46 (1972). The stipulation must, however, be clear, unequivocal and complete. Ibid.; State v. Hollander, 201 N.J. Super. 453, 477 (App.Div.), certif. den. 101 N.J. 335 (1985).
Defendant's Sixth Amendment right to counsel attached following "the initiation of adversary judicial criminal proceedings" against him. Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 417 (1972); State v. Sugar, 84 N.J. 1, 16 (1980). Accord, State v. Burden, 155 N.J. Super. 462, 465 (App.Div. 1977). A suspect has no Sixth Amendment right to counsel during the pre-charging investigatory stage. State v. Darby, 211 N.J. Super. 367, 373 (App.Div.), certif. den. 105 N.J. 559 (1986); State v. Porter, 210 N.J. Super. 383, 392-393 (App.Div.), certif. den. 105 N.J. 557 (1986). Under the facts presented, defendant's Sixth Amendment right to counsel had not attached at the time he entered into the stipulation. *264 Although defendant was in custody based on his arrest for an unrelated charge at the time he signed the stipulation, he had not been formally charged for the offenses involved here. The fact that the investigation had focused on defendant did not convert this into a post-charging proceeding. Indeed, defendant was not formally charged until after he gave the inculpatory statement which followed the polygraph examination. Furthermore, the Sixth Amendment right to counsel, like other constitutional rights, may be waived. Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); Moore v. Michigan, 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed.2d 167 (1957); State v. Davis, 45 N.J. 195, 198-199 (1965); State v. Guerin, 208 N.J. Super. 527, 532-533 (App.Div. 1986).
As noted previously, Miranda accorded defendant a Fifth Amendment right to counsel during the pre-charging investigatory stage insofar as any custodial interrogation. Unlike three other jurisdictions, see State v. Pederson, 44 Wash. App. 391, 722 P.2d 127, 129-130 (1986); State v. Souel, 53 Ohio St.2d 123, 372 N.E.2d 1318, 1323 (1978); State v. Valdez, 91 Ariz. 274, 371 P.2d 894, 900 (1962), New Jersey has not precluded in any reported decision the waiver of the right to an attorney during the execution of a polygraph stipulation or the polygraph examination. We decline to so hold in this case. State v. McDavitt, supra, has established the terms and conditions of a polygraph stipulation and it does not prohibit the waiver of the right to counsel at the signing of the stipulation. Any change or extension of those established conditions should come from our Supreme Court. Here, however, before the stipulation was signed, defendant received Miranda warnings and he waived any right to the presence of an attorney. Furthermore, the stipulation itself contained a waiver of the right to have counsel present during the examination. Defendant in the present case, as well as the defendant in State v. Powell, 98 N.J. 63 (1984), reversing on the dissent, 197 N.J. Super. 191, 194 (App.Div. 1983), knowingly and intelligently waived any right he may have had to an attorney in connection *265 with the polygraph stipulation. Even though the absence of counsel may be a factor to consider in determining whether defendant knowingly and intentionally entered into the polygraph stipulation, see State v. McDavitt, 62 N.J. at 41-42; State v. Sloan, 226 N.J. Super. 605, 613-615 (App.Div.), certif. den. 113 N.J. 647 (1988); State v. McMahon, 217 N.J. Super. 182, 184-187 (Law Div. 1986), counsel's presence is not a nonwaivable condition.
We are therefore satisfied that the polygraph results were properly admitted into evidence because the test was administered "after a knowing and intelligent waiver by defendant of his right to counsel and upon a stipulation that was fully understood by him." State v. Powell, 197 N.J. Super. at 194 (Shebell, J., dissenting). In any event, the evidence of guilt, independent of the polygraph, was simply overwhelming.
The judgment of conviction is affirmed.
D'ANNUNZIO, J.A.D. (concurring).
I have reservations regarding the enforceability at trial of an uncounseled polygraph stipulation.
Defendant, unrepresented by counsel, entered into a five-page contract with the State. The contract controlled the admission and exclusion at trial of evidence pertaining to a contemplated polygraph examination. The police had initiated the idea of a polygraph examination during defendant's custodial interrogation. An assistant prosecutor, a lawyer representing the State, presented and explained the contract to defendant. The contract provided that the results of the polygraph examination, i.e., the operator's opinion "as to whether or not the subject exhibited evidence of attempts at deception," would be admissible on behalf of either the State or the defendant. The operator was an investigator employed by the prosecutor's office.
Defendant also contracted away a number of basic rights, including the right to introduce the testimony of another expert *266 witness "in reference to the original polygraph expert's testimony." Thus, at trial, any attack on the State's expert's qualifications or opinions or on the test's methodology and reliability was limited to cross-examination of the State's expert. But cf. State v. Baskerville, 73 N.J. 230, 233-234 (1977) (defendant may produce at trial testimony of his own polygraph expert in the absence of an unequivocal stipulation to the contrary; issue of enforcement of an unequivocal waiver of the right to produce evidence raised but not decided).
The contract also provided that defendant waived his right to refuse to answer any question at any time. The waiver of that right was expressly provided for in paragraph (9)(d), and it is also implied in paragraph (2) which stated that if defendant did not cooperate during the examination "necessitating that the testing be terminated, both such failure to cooperate and the resultant termination will be introduced at trial for the jury's consideration." Thus, the contract deprived defendant of a "continuous opportunity to exercise" his right of silence and counsel. Miranda v. Arizona, 384 U.S. 436, 444-445, 86 S.Ct. 1602, 1612-1613, 16 L.Ed.2d 694 (1966).
The issue, which fairly jumps out of the record, is whether this uncounseled contract should have been enforced at trial. See generally, State v. Valdez, 91 Ariz. 274, 371 P.2d 894 (1962) (polygraph stipulation must be signed by defense counsel); accord, State v. Pederson, 44 Wash. App. 391, 722 P.2d 127 (Court of Appeals, 1986);[1] Katz, "Dilemmas of Polygraph *267 Stipulations," 14 Seton Hall L.Rev. 285 (1984). The issue is one of first impression in New Jersey. State v. Powell, 98 N.J. 63 (1984), reversing on dissent, 197 N.J. Super. 191 (App.Div. 1983), did not address the counsel issue because it was not raised. The Appellate Division majority in Powell had affirmed suppression of the polygraph examination because it agreed with the trial judge that defendant had executed the stipulation "without actual knowledge of the consequence of the polygraph examination." 197 N.J. Super. 193. Moreover, the Powell opinions did not indicate whether the Powell stipulation included defendant's waiver of the right to present expert testimony to attack the admitted polygraph examination, the right to present another polygraph examination and the right to terminate the polygraph examination at any time.
In State v. McDavitt, 62 N.J. 36 (1972), defendant had entered into the stipulation with the advice of counsel, as was the case in State v. Baskerville, 73 N.J. 230, 236 (1977); State v. Capone, 215 N.J. Super. 497 (App.Div. 1987); State v. South, 136 N.J. Super. 402, 406 (App.Div. 1975), certif. den., 69 N.J. 387 (1976); State v. Taylor, 139 N.J. Super. 301, 304 (App.Div. 1976) (stipulation regarding admissibility of witness' polygraph examination), certif. den., 71 N.J. 495 (1976); and State v. McMahon, 217 N.J. Super. 182, 185 (Law Div. 1986).
Reliance on the principles that the right to counsel does not attach until the initiation of adversary criminal proceedings and that a defendant has the right to waive counsel and his Fifth Amendment privileges is an inadequate response to the issue. There is a significant difference between giving a statement to the police which may be admitted against a defendant at trial *268 and agreeing to the admissibility of evidence as well as to the exclusion of rebutting probative evidence.
I write to raise the issue and to express my reservations regarding the majority's disposition of it. I do not attempt to resolve it because this case is an inappropriate vehicle in which to do so. Although defendant's trial counsel moved to suppress the polygraph evidence on the ground that defendant did not fully understand the stipulation, defendant did not expressly contend that the contract was void due to lack of counsel. Moreover, defendant did not proffer evidence to rebut the polygraph examiner's testimony. Consequently, enforceability of the restrictions placed on defense evidence was not raised. More important, even if the polygraph evidence should not have been admitted, it was harmless error under the circumstances of this case. See State v. Sloan, 226 N.J. Super. 605, 616 (App.Div. 1988), certif. den., 113 N.J. 647 (1988); United States v. Morrow 731 F.2d 233 (4th Cir.1984), cert. den., 467 U.S. 1230, 104 S.Ct. 2689, 81 L.Ed.2d 883 (1984). There was overwhelming evidence of defendant's guilt. Circumstantial evidence tended to corroborate defendant's confession and the victim's identification of him. Circumstantial evidence included the hard hat in defendant's work locker similar to the hard hat worn by the assailant. In addition, defendant worked a few minutes walk from the crime scene, possessed a knife resembling the knife used by the assailant and attempted to change his appearance shortly after a composite drawing was posted at his work place. Defendant's blood type also matched the assailant's blood type. Thus, I concur in the affirmance of defendant's conviction.
NOTES
[1] In Pederson the court discussed the rationale for requiring defense counsel's signature:

Unfortunately, neither [State v.] Renfro [96 Wash.2d 902, 639 P.2d 737 (1982)] nor Valdez provides a rationale for requiring an attorney's signature. There is suggestion in an opinion that predates Valdez, however, that the rule arises from the appropriateness of requiring opposing attorneys to negotiate the terms of a legally binding document. State v. McNamara, 252 Iowa 19, 28, 104 N.W.2d 568, 574 (1960). Another likely reason for the requirement is that the decision to sign a polygraph stipulation is essentially a decision not to object to otherwise inadmissible evidence and thus could be classified as trial strategy, ordinarily the exclusive domain of the lawyer. It is clear, at the very least, that this requirement ensures that defense counsel can properly advise his client regarding his rights and the risks entailed by such a test and, if strictly construed, will block an impetuous decision of the client. [722 P.2d at 129.]