[No. 7367–6–II.   Division Two.   July 16, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. GORDON
LESLIE PEDERSON, *Appellant.*

*Albert Armstrong,* for appellant.

*Arthur D. Curtis, Prosecuting Attorney,* and *James Swanger, Deputy,* for respondent.

REED, A.C.J.—Gordon Pederson appeals his conviction of

second degree burglary. Of the issues raised by defendant on appeal, only two merit discussion. They are: whether the trial court erred (1) in admitting the testimony of a polygrapher who had examined Pederson pursuant to stipulation, and (2) in admitting evidence of Pederson's prior felony conviction. Finding that the court did not err in admitting the polygraph expert's testimony, but that admission of the prior conviction was error of constitutional magnitude and not harmless, we reverse and remand for a new trial.

A store in Amboy was entered illegally during the night of June 9 and 10, 1983, through an attic window. The attic floor was broken through, and clothing and camping gear were taken from the floor below. John Byers, a friend of Pederson's, testified that Pederson had appeared at Byers' home in the early morning of June 10 with a man named Dave and a woman, both of whom were unknown to Byers. Pederson's truck had broken down and he requested Byers' assistance. When the truck was driven up into Byers' driveway, Byers saw that its bed was filled with clothing and camping gear. Pederson and his companions obtained a ride into Vancouver. Byers left the house too, but later that day, when he returned, the truck had been moved behind his house and the bed had been emptied. From the truck bed police later seized insulation fibers that were like those that had been severed in breaking through the attic floor of the store in Amboy.

Pederson and a friend, David Wilford, were arrested when they returned to the truck. The stolen goods were recovered at the Vancouver apartment of Lorna Roberts, Wilford's girl friend. Wilford and Pederson were charged with second degree burglary. Wilford pleaded guilty and testified against Pederson. Wilford confirmed that he and Roberts had been Pederson's companions at Byers' home. Wilford testified that Pederson had participated in the burglary by entering with Wilford and remaining in the attic to throw stolen merchandise to the ground after Wilford handed it up to him. Pederson denied his participa-

tion, testifying on his own behalf that he had fallen into a drunken stupor in his truck and had awakened to find that his drinking companion, Wilford, had burglarized the store and loaded the stolen merchandise into the truck.

Before trial, Pederson asked to have a polygraph administered. Pederson's lawyer prepared, on legal form paper imprinted with his firm's name and address, a stipulation that the results of the polygraph, (otherwise inadmissible for or against Pederson) would be admissible "by [sic] either party subject to evidentiary objections." The stipulation, although prepared by the defense, made no reference to a waiver of constitutional rights. The stipulation was prepared for the signatures of the deputy prosecuting attorney and of Pederson only, without any space for defense counsel's own signature. Only the deputy prosecutor and Pederson signed.

The polygrapher agreed upon was unavailable on the date stipulated, and defense counsel moved for continuance of the scheduled trial date, so that an examination could be obtained. He argued that Lorna Roberts could not then be located, making it "even more imperative" that Pederson "be allowed the opportunity to bolster his testimony via the use of a polygraph examination." When the examiner still could not schedule an examination, Pederson's lawyer presented an order, over his signature, to the trial judge for appointment of Dr. Stanley Abrams, an expert selected by the defense and approved by the State.

At trial, when the State offered Dr. Abrams' testimony, the defense objected on the basis that counsel had not signed the stipulation. Defense counsel conceded that his omission had been inadvertent—he had not been aware of the case law requiring his signature—and that he had obtained a continuance and the appointment of Dr. Abrams.[1] However, he attempted to minimize the signifi-

---

[1]Defense counsel's exact words were: "So insofar as my position on this, I never signed the stipulation. I would admit that it was done inadvertently before I knew I was required to sign it. I cannot represent to this Court that I have never

cance of his actions by explaining that, although he had wished to cooperate with Pederson's desire to be examined, he had nevertheless advised him several time not to undergo polygraphy. The objection was overruled and Dr. Abrams testified that Pederson's responses to the test questions were not truthful.

Before Pederson testified on his own behalf, the defense moved in limine to exclude cross examination on a prior conviction for attempted first degree escape. The motion was denied and Pederson conceded that he had been convicted.

We first consider whether the trial court erred in admitting Dr. Abrams' testimony. Until 1972 Washington generally did not permit the admission of polygraph results, even with consent of the parties. *See State v. Stiltner,* 80 Wn.2d 47, 51, 491 P.2d 1043 (1971); *State v. Rowe,* 77 Wn.2d 955, 958, 468 P.2d 1000 (1970). In *State v. Ross,* 7 Wn. App. 62, 497 P.2d 1343, 53 A.L.R.3d 997, *review denied,* 81 Wn.2d 1003 (1972), this court ruled that polygraph results may be admitted for the purpose of corroboration under conditions laid down in *State v. Valdez,* 91 Ariz. 274, 371 P.2d 894 (1962). Those conditions are: (1) there must be a stipulation signed by the prosecuting attorney, the defendant *and the defendant's counsel*; (2) the trial judge must, in any event, exercise his discretion in determining whether the examiner was qualified and whether the test was conducted under proper circumstances; (3) the opposing party has the right to cross–examine the polygrapher on his qualifications, the testing conditions, the limitations of polygraphy, and any other matter deemed pertinent by the trial judge; and (4) the jury must be instructed that the examiner's testimony could prove or disprove, at most, the examinee's truthfulness at the time of the examination. The Washing-

---

been a party to Dr. Abrams' testing of Mr. Pederson, because that's not the way it went. In fact, I, on behalf of Mr. Pederson, made several requests for a polygraph examination. It should be noted that was not my idea. That was Mr. Pederson's idea."

ton Supreme Court later adopted these standards in toto. *State v. Renfro,* 96 Wn.2d 902, 906–07, 639 P.2d 737, *cert. denied,* 459 U.S. 842 (1982). We will refer to them here as the *Valdez/Renfro* standards.

Pederson argues that his trial counsel's failure to sign the stipulation requires reversal. We therefore ask whether the lack of a defense attorney's signature must in all cases vitiate such a stipulation.

Unfortunately, neither *Renfro* nor *Valdez* provides a rationale for requiring an attorney's signature. There is suggestion in an opinion that predates *Valdez,* however, that the rule arises from the appropriateness of requiring opposing attorneys to *negotiate* the terms of a legally binding document. *State v. McNamara,* 252 Iowa 19, 104 N.W.2d 568, 574 (1960). Another likely reason for the requirement is that the decision to sign a polygraph stipulation is essentially a decision not to object to otherwise inadmissible evidence and thus could be classified as trial strategy, ordinarily the exclusive domain of the lawyer. It is clear, at the very least, that this requirement ensures that defense counsel can properly advise his client regarding his rights and the risks entailed by such a test and, if strictly construed, will block an impetuous decision of the client.

In any event, we believe that substantial rather than strict compliance with the *Valdez/Renfro* standards is sufficient. We find substantial compliance in this case. Any conceivable purpose of the signature requirement was satisfied. Defendant's attorney conceded that he had only inadvertently failed to sign—because of ignorance of the precise terms of the *Valdez/Renfro* standards. Nevertheless he did nothing, either orally before the trial court or in his written motions, to obstruct his client's desire to undergo polygraphy. Once Pederson elected not to follow his lawyer's advice, the latter actively ensured that his client would be tested. He certainly "negotiated" the stipulation, and it is clear he advised Pederson of his rights and the dangers of such a stipulation. On these facts the *Valdez/ Renfro* requirements were substantially satisfied; the trial

court did not err when it permitted Dr. Abrams to testify.[2]

■■ Pederson also contends that, even if the *Valdez/ Renfro* standards are satisfied otherwise, the trial judge abused his discretion by admitting the test results. However, discretion is abused only when it can be said that no reasonable person would take the view adopted by the trial court. *State v. Blight,* 89 Wn.2d 38, 41, 569 P.2d 1129 (1977). The trial court allowed sufficient latitude on cross examination. We find no abuse of discretion.

■■ Pederson next assigns error to permitting the use of his prior conviction for impeachment purposes. The State in effect concedes this was improper, and devotes its entire argument to harmless error. We cannot agree. Error in admitting evidence of a prior conviction for impeachment purposes is of constitutional magnitude, and conviction after such error must be reversed unless the error was harmless beyond a reasonable doubt. *State v. Jones,* 101 Wn.2d 113, 124–25, 677 P.2d 131 (1984). In order to find the error harmless we must find overwhelming untainted evidence of guilt. *State v. Guloy,* 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied,* 106 S. Ct. 1208 (1986). We cannot do so in this case because, as the deputy prosecutor argued so forcefully when seeking admission of the conviction, "the central issue [in this case] is actually credibility." Except for the accomplice testimony of Wilford there was little proof linking defendant to the actual burglary. The only other evidence consisted of the admitted presence of the stolen goods in defendant's pickup and his failure to pass the lie detector test. This last, although stipulated to, remains suspect in the eyes of the law. When all of this evidence is considered together it hardly can be described as overwhelming evidence of guilt.

Defendant's other assignments of error either are totally without merit or were not properly raised in the trial court.

---

[2]It should be observed that even the *Renfro* court did not insist upon strict compliance, when the trial court did not give the instruction *required* by *Valdez's* fourth requirement.

Defendant's conviction is reversed and the matter is remanded for a new trial.

PETRICH, J., concurs.

ALEXANDER, J. (dissenting)—I concur in the result reached by the majority, insofar as it finds that the trial court committed reversible error in admitting evidence of Pederson's prior conviction. However, I respectfully dissent from its holding that the trial court did not err in admitting the testimony of the polygrapher, Dr. Stanley Abrams. On retrial of the case, I strongly believe that the polygraph evidence should be excluded.

The majority has recognized that the requirements for admission of polygraph results set forth in *State v. Renfro,* 96 Wn.2d 902, 639 P.2d 737, *cert. denied,* 459 U.S. 842 (1982) have not been complied with strictly. Nevertheless, it holds that substantial compliance with those standards occurred and that this compliance was sufficient. I disagree, because in my view, anything less than strict compliance with the *Renfro* standards should preclude admission of polygraph results at trial. Furthermore, I do not believe there has been substantial compliance with the *Renfro* requirements in this case, even if that degree of compliance is legally sufficient to support admission of the polygraph results.

The majority acknowledges that the courts of this state, along with courts of other jurisdictions, have long taken a rather jaundiced view of the polygraph. It was not until 1972 that polygraph results were deemed admissible in courts of this state. *State v. Ross,* 7 Wn. App. 62, 69, 497 P.2d 1343, 53 A.L.R.3d 997, *review denied,* 81 Wn.2d 1003 (1972). Courts have expressed reluctance to admit polygraph results under any conditions because they have had concerns about the reliability of the test and the capacity of such evidence to cause extreme prejudice. *See* Annot., *Admissibility of Lie Detector Test Taken Upon Stipulation That the Result Will Be Admissible in Evidence,* 53

A.L.R.3d 1005 (1973). Even in *State v. Renfro, supra,* the majority conceded that the evidence was insufficient for the court to conclude "that the polygraph has risen to the level where it can be said that it is reliable enough to be consistent with the standard of guilt required in criminal cases." *Renfro,* 96 Wn.2d at 905. No Washington case exists since *Renfro* that has expressed any more favorable view about the reliability of the polygraph machine and the results produced by it.

In light of the criticisms that courts of this state and others have leveled at the polygraph, I find it difficult to believe that substantial compliance with the explicit *Renfro* standards is sufficient to justify admission of this evidence.

In *State v. Renfro,* the court stated that "[m]ore than a stipulation *by the parties* is needed, however. There must be further safeguards before polygraph evidence may be admitted." (Italics mine.) *Renfro,* 96 Wn.2d at 906. The court proceeded to set forth the requirements for admission, including the requirement that the "[prosecuting] attorney, defendant *and his counsel all sign* a written stipulation providing for defendant's submission to the test *and for the subsequent admission at trial of the graphs* and the examiner's opinion thereon . . ." (Italics mine.) *Renfro,* 96 Wn.2d at 906.

The majority concedes that Pederson's defense counsel did not sign the written stipulation. In fact, the stipulation did not contain a block for counsel's signature. Furthermore, the stipulation did not contain all of the language dictated by *Renfro,* relating to the admission at trial of the graphs. Additionally, the written stipulation signed by Pederson was for a test to be administered by Michael Davidson, a person other than the person who actually performed the test and then testified at trial. Finally, the stipulation was equivocal in that it was made "subject to evidentiary objections." The stipulation, thus, fails in numerous respects to measure up to the strict standards required by *Renfro.*

Even assuming that substantial compliance with *Renfro*'s

requirements would justify admission of polygraph results, I do not believe that such compliance is present here. Defense counsel, as I have noted, did not sign the stipulation, and he objected vehemently at trial to the admission of the polygraph testimony. The majority explains this away by pointing out that Pederson's counsel negotiated, prepared, and discussed the stipulation with his client. It further notes that counsel did nothing before trial to obstruct his client's desire to undergo the polygraph examination.

The record reflects, however, that defense counsel did not acquiesce in his client's decision to take the test. The attorney was only acting to carry out his client's wishes, notwithstanding his advice to his client to decline to take the test. An attorney whose advice is not accepted is in a difficult position, and we should be slow to read the attorney's advocacy of his client's position as evidence of the attorney's own views.

The majority points to the attorney's statement that his failure to sign the stipulation was "inadvertent." That statement, however, must be viewed against the backdrop of counsel's admitted lack of knowledge of all of the elements of the *Renfro* standards. The attorney apparently did not know until after the test was administered that he, in effect, had a veto right over his client's ability to stipulate to the admissibility of the polygraph results. Therefore, any support for a finding of substantial compliance with *Renfro* that can be taken from the attorney's statement is diminished by his lack of awareness of the significant role he was to play in the decision to stipulate to the admission of test results. In light of his expressed opposition to the test, I find it inconceivable that the attorney would have stipulated to the admissibility of the test results if he had been fully aware of his role under *Renfro*.

I must acknowledge that I possess a somewhat critical view of the polygraph in general. Much has been written through the years about its inherent unreliability. I am, frankly, more in tune with the views expressed by the dis-

senting Justices, Dore and Rosellini, in *State v. Renfro,* 96 Wn.2d 910–14. Even the majority in *Renfro* observed that "mere stipulation by the parties will not increase the reliability of a polygraph test." *Renfro,* 96 Wn.2d at 905. The majority in *Renfro* believed, as apparently the majority does in this case, that the stipulating parties in effect "gamble that the test will prove favorable to them." *Renfro,* 96 Wn.2d at 906. According to this view, the gamblers may not be heard to complain if the numbers on the dice do not come up as they had hoped. I am not comfortable with this analysis because a trial is not a game; rather, it is a search for the truth. Evidence that is generally recognized to be unreliable should not go before a trier of fact on issues of guilt or innocence if it is objected to at trial.

In our state and nation, juries determine credibility of witnesses. This system has served us well, and the province of juries should not be invaded by mindless machines until these machines are perfected further, if ever they can be. I recognize that this view was rejected somewhat when in *State v. Ross, supra,* and *State v. Renfro, supra,* our courts indicated that polygraph results could come into evidence on stipulation of the parties *and attorneys.* In this case, however, no such stipulation was made, and the polygraph evidence should not be admitted at the retrial of this case.

Review denied by Supreme Court October 7, 1986.